No. 23-1841

# In the
# United States Court of Appeals
## for the Fourth Circuit

———————————

MARINE CLUB MANAGER, INC., EBRM RESURRECTION LLC, and ERIC
BLUMENFELD,

*Petitioners-Appellants*

v.

RB COMMERCIAL MORTGAGE, LLC,

*Respondent-Appellee*

**On Appeal from the United States District Court
for the Western District of North Carolina at Asheville**

———————————

**BRIEF OF PETITIONERS-APPELLANTS**
———————————

Neil A. Riemann
PARRY LAW PLLC
100 Europa Center Drive, Suite 351
Chapel Hill, NC 27517
(919) 913-3316
nar@parryfirm.com

Benjamin A. Garber
Melissa A. Anderson
BRAVERMAN KASKEY GARBER P.C.
One Liberty Place
1650 Market Street, 56th Floor
Philadelphia, PA 19103
(215) 575-3800
bgarber@braverlaw.com
anderson@braverelaw.com

*Counsel for Petitioners-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1, Petitioners-Appellants Marine Club Manager, Inc., EBRM Resurrection LLC, and Eric Blumenfeld make the following disclosure:

1.      Is party/amicus a publicly held corporation or other publicly held entity? No.

2.      Does party/amicus have any parent corporations?  No.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  No.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))?  No.

5.      Is party a trade association?  No.

6.      Does this case arise out of a bankruptcy proceeding?  No.

Dated: September 25, 2023              */s/ Benjamin A. Garber*
                                       Benjamin A. Garber
                                       *Counsel for Petitioners-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………….……..i

TABLE OF AUTHORITIES………………………………………...iii

JURISDICTIONAL STATEMENT……………………………....1

STATEMENT OF ISSUES……………………………………….……..1

STATEMENT OF THE CASE……………………………………….5

    I.    Factual Predicates To The Arbitration………………………...7

    II.    The Underlying Arbitration……………………………………..12

SUMMARY OF ARGUMENT……………………………………...18

ARGUMENT………………………………………………………...20

    I.    STANDARD OF REVIEW…………………………………….20

    II.    DISCUSSION OF ISSUES……………………………………..22

        A.    The Arbitrator Manifestly Disregarded Delaware Law In Failing To Apply The Plain And Unambiguous Terms Of Section 13.2 Of The Operating Agreement And Instead Disregarded And Modified Section 13.2 Based Upon Own Her Personal Notions Of Right And Wrong In Concluding That Mr. Blumenfeld Could Not Redeem RB Pursuant To That Section Utilizing Non-Property Proceeds Despite The Senior Lender Having Not Claim Against Him As Guarantor Of The Senior Loan…………………………………22

        B.    The Arbitrator Exceeded Her Powers And Denied Appellants A Fundamentally Fair Hearing By Adjudicating A New Issue Raised For The First Time By RB After The Conclusion Of The Hearing And The Issuance Of The Partial Award Without Providing Appellants Any Opportunity For Discovery, A Hearing, Or Briefing Regarding Whether Mr. Blumenfeld Can Redeem RB Pursuant To Section 13.2 Of The OA……………26

        C.    The Arbitrator Manifestly Disregarded Delaware Law In Awarding Unreasonable Attorneys Fees To RB, Who Did Not Incur Such

i

Fees "Out-Of-Pocket" As Required By Section 15.19 Of The Operating Agreement And Instead Awarded Those Fees To RB Based Upon Her Own Personal Notions Of Right And Wrong…27

D.   In The Alternative, The Arbitrator Manifestly Disregarded Delaware Law Requiring The Application Of Plain And Unambiguous Contract Terms By Declaring Full Recourse Events Have Occurred And Modified The Definitions Of Full Recourse Events Such That The Declaratory Judgment Portion Of The Award Declaring That Full Recourse Events Have Occurred Fails To Draw Its Essence From The OA……………………………...29

E.   The Arbitrator Manifestly Disregarded Delaware Law Requiring The Application Of Plain And Unambiguous Contract Terms By Declaring Changeover Events Have Occurred And Instead Modified The Definitions Of Changeover Events, And, Therefore, The Declaratory Judgment Portion Of The Award Declaring That Changeover Events Have Occurred Fails To Draw Its Essence From The OA……………………………………………………32

F.   The Arbitrator Manifestly Disregarded Delaware Law In Failing To Apply The Plain And Unambiguous Language Of The OA To Appellants' Claims Of Material Breach And Instead Modified The Breached Provisions Based On Her Own Notions Of Right And Wrong Such That The Denial Of Those Claims In The Award Is Not Drawn From The Essence Of The OA………………………36

CONCLUSION……………………………………………………………...38

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. 32(A)…………….…40

ii

# TABLE OF AUTHORITIES

C<small>ASES</small>

*Apex Plumbing Supply, Inc. v. U.S. Supply Co.*,
    142 F.3d 188 (4th Cir. 1998)……………………………………………21

*Choice Hotels Int'l, Inc. v. SM Property Mgmt., LLC*,
    519 F.3d 200 (4th Cir. 2008)……………………………………………20

*Int'l Union, United Mine Workers of America v. Marrowbone Dev. Co.*,
    232 F.3d 383 (4th Cir. 2000)…………………………………………..20, 22

*Jones v. Dancel*,
    792 F.3d 395 (4th Cir. 2015)……………………………………………21

*Lorillard Tobacco v. Am. Legacy Found.*,
    903 A.2d 728 (Del. 2006)………………………………………………22

*Mahani v. Edix Media Gp., Inc.*,
    935 A.2d 242 (Del. 2007)………………………………………………28

*Patten v. Signator Ins. Agency, Inc.*,
    441 F.3d 230 (4th Cir. 2006)……………………………………………21

*Warfield v. ICON Advisers, Inc.*,
    26 F.4th 666 (4th Cir. 2022)…………………………………………….21

S<small>TATUTES</small>

9 U.S.C. § 10…………………………………………………………...21

9 U.S.C. § 16…………………………………………………………….1

28 U.S.C. § 1291………………………………………………………...1

28 U.S.C. § 1332………………………………………………………...1

O<small>THER</small> A<small>UTHORITY</small>

Del. Lawyers' Rules of Prof'l Conduct R. 1.5(a)…………………………28

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has jurisdiction on appeal under 28 U.S.C. § 1291, because Appellants timely appealed from a final judgment disposing of all claims, as well a 9 U.S.C. § 16 because the appeal is from a judgment under the Federal Arbitration Act. The district court entered its judgment in this matter on August 2, 2023, and Appellants appealed that judgment by Notice of Appeal dated August 10, 2023.

## STATEMENT OF ISSUES

1.     Did the district court err by refusing to vacate the portion of the arbitration award that concluded that Appellant Eric Blumenfeld could not pay the Required Redemption Amount as calculated by the arbitrator utilizing non-Property Proceeds pursuant to section 13.2 of the Operating Agreement until the Senior Loan is current?

2.     Did the district court err by refusing to vacate the portion of the arbitration award that concluded that Mr. Blumenfeld could not pay the Required Redemption because the arbitrator exceeded her authority and denied Appellants a fundamentally fair hearing by adjudicating this new issue raised for the first time by RB after the conclusion of the hearing, the parties' post-trial briefing, and the

4

issuance of the Partial Award determining liability?

3.      Did the district court err by refusing to vacate the portion of the arbitration award because it was issued with manifest disregard of the law by failing to follow binding Delaware law applying the plain and unambiguous language of the Company's Operating Agreement and the Recognition Agreement as to the award's declarations that certain Changeover and Full Recourse Events have occurred such that the award was not derived from the essence of the Operating Agreement?

4.      Did the district court err by refusing to vacate the portion of the arbitration award that summarily denied Appellants' claims of RB's material breach of the OA because it was issued with manifest disregard for the law by failing to following binding Delaware law applying the plain and unambiguous language of the Company's Operating Agreement such that the award was not derived from the essence of the Operating Agreement?

## STATEMENT OF THE CASE

This matter came before the district court on cross motions to vacate, modify, or correct the arbitration award and appellate award, and to confirm the award and appellate award.  JA1.  The district court issued an order denying the petitions to vacate and granting the motion to confirm the awards on August 1, 2023, with judgment entered on August 2, 2023.  JA2270, JA2287.

5

RB initiated this arbitration pursuant to the American Arbitration Association's ("AAA") Commercial Rules, seeking declaratory judgments against Appellants that Changeover Events have occurred such that RB can exercise certain remedies such as replacing Marine Club Manager, Inc. as the manager of the Property, so that RB can sell the Property and use the proceeds to pay itself the Required Redemption Amount, and that Full Recourse Events have occurred such that RB can seek full recourse of the Required Redemption Amount directly against Mr. Blumenfeld as Sponsor/Operating Member. JA265–301. The only relief sought by RB is the repayment of the Required Redemption Amount, the repayment of which it admits fully and completely extinguishes its equity interest and rights in the Company. JA301.

Marine Club Manager, Inc., EBRM Resurrection LLC, and Eric Blumenfeld counterclaimed against RB, alleging that no Changeover or Full Recourse Events have occurred, and that even if they had, RB materially breached the implied and express provisions of the Operating Agreement such that any further performance by Appellants was discharged because RB has failed to cure its material breaches. JA332–349. Further, RB's material breaches directly caused the Company's default on the Senior Loan and also prevented the Company from obtaining Covid-19 relief from the Senior Lender, which would have prevented the default of the Senior Loan. JA699–704.

6

## I. Factual Predicates To The Arbitration

Mr. Blumenfeld is a transformative real estate and community developer well-known in Philadelphia for his renovation of historical buildings that have fallen into disrepair. JA11. As part of his efforts, Mr. Blumenfeld renovated the Marine Club located at 1100 South Broad Street, Philadelphia, Pennsylvania, a dilapidated former Quartermaster's depot, into an amenity filled apartment complex over twenty-five years ago (the "Property"). JA11.

In 2014, Mr. Blumenfeld recapitalized his ownership of the Marine Club through a senior mortgage loan on the Property (the "Senior Loan") in addition to the formation of an LLC through which RB would invest $3,350,000 in preferred equity in exchange for an 8% membership equity interest in Marine Club Associates, LLC, with Mr. Blumenfeld retaining the remaining equity. JA11. Mr. Blumenfeld and RB, along with Marine Club Manager, Inc. (owned wholly by Mr. Blumenfeld) thus formed Marine Club Associates, LLC (the "Company") (a non-party to this action) as a special purpose entity. JA11. The Company is governed by an Operating Agreement (the "OA").[1] JA24.

Although RB's investment in the Company is a form of equity, it functions like debt in that the Company makes a monthly payment to RB called a "Minimum Distribution." JA11. The Minimum Distribution consists of a principal payment as

---

[1] Capitalized terms herein not otherwise defined are terms defined in the OA.

7

well as a 12.5% preferred return rate, effectively the interest rate.  JA11.  Section 7.2

of the OA contains a provision colloquially referred to as a "waterfall" 'that

determines the priority of distributions of the Property's Proceeds.  JA12; JA55.

Under the waterfall, RB cannot receive its monthly Minimum Distribution until the

Company has paid the tax and insurance escrows and monthly debt service on the

Senior Loan, the operating expenses for the Property, and any other payments due

under the Senior Loan.  JA12; JA55.  Under the terms of the Operating Agreement,

the Company would make these monthly Minimum Distributions for ten years, after

which RB's preferred equity interest would be "redeemed," meaning that it would

effectively be paid off and RB would no longer have any ownership interest in the

Company.  JA12.

Under the terms of the Operating Agreement, RB's preferred equity

investment can be also voluntarily "redeemed" at any time pursuant to section 12.1

of the OA by the payment of the Required Redemption Amount (the "RRA" or

"Required Redemption Amount"), which consists of the unpaid principal, the

preferred return rate, and any assessment of the default interest rate.  JA12; JA65.

Once the Required Redemption Amount is paid, RB's position in the Company (and

any rights it has thereto) is "extinguished."  JA12; JA65.  The Operating Agreement

provides that a Voluntary Redemption by the Company must abide by a payment

distribution priority schedule colloquially referred to as a waterfall contained in

section 7.2 of the OA whereby the Company's Property Proceeds cannot be utilized to redeem RB unless the Senior Loan is current.  JA65.

Under the terms of the OA, Mr. Blumenfeld as "Sponsor" of the preferred equity investment may also directly redeem RB pursuant to section 13.2 of the OA upon the occurrence of one of the listed actions.[2]  JA13; JA66.  The import of this provision is that Mr. Blumenfeld is directly liable to RB for the payment of the RRA, and RB may seek redemption directly from him without regard to the payment priorities contained in section 7.2's waterfall.  Upon the occurrence of a Full Recourse Event, as specified in the OA, "the Capital Member's Investment shall thereupon be redeemed."  JA66.

As part of the Senior Loan and preferred equity investment, the Senior Lender and RB Commercial entered into a Recognition Agreement on November 14, 2014, the same day as the execution of the other agreements, "in order to set forth the relative rights, obligations and priorities which each have with respect to the payment and collection of the Debt on one hand, and the exercise of the

---

[2] "Section 13.2  <u>Full Recourse</u>.  In addition, the Sponsor [Mr. Blumenfeld] shall become fully liable for the repayment of the Required Redemption Amount (and the Capital Member's Investment shall thereupon be redeemed) upon the occurrence of the following:

[occurrences omitted]

Notwithstanding the forgoing, for so long as Sponsor is a guarantor under the Senior Mortgage Loan Documents, any indebtedness of Sponsor to Capital Member resulting under this Section 13, either before or hereafter existing, together with any interest thereon, shall be, and such indebtedness is, subordinated to any **claim** of the Senior Lender against Sponsor under the Senior Loan Documents."

(emphasis added).  JA66.

Preferred Equity Holder Remedies and rights to distributions in respect of the

Preferred Equity Interest on the other hand." JA236. Under the Recognition

Agreement, RB must immediately turnover to the Senior Lender any distributions

from the Company ahead of the Senior Lender as determined by the waterfall

contained in section 7.2 of the Operating Agreement. JA13; JA238. RB, however,

is expressly permitted to receive funds from Mr. Blumenfeld directly so long as the

Senior Lender does not have a claim against Mr. Blumenfeld as guarantor of the

Senior Loan.[3] JA14; JA241.

On October 22, 2019, the Senior Lender without notice increased the

Company's tax escrow payment by $46,278 per month (128% increase) and the

insurance escrow payment by $42,205.42 per month (500% increase), resulting in a

total increase of $88,483.42.[4] JA696. The Company could not absorb a $88,483.42

---

[3] "From and after the date that Preferred Equity Holder has received a notice that a Cash Trap
Period has occurred until the date that Preferred Equity Holder has received notice from Lender
that such Cash Trap Period has been cured . . . Preferred Equity Holder covenants and agrees
that no distribution or other payments (other than from funds of any Person which is not a
Borrower Party) shall be made by or required from any Borrower Party with respect to the
Preferred Equity Interest . . . unless and until the Debt has been completely paid in all respects, .
. . ; *provided, however*, that in the case of any distributions or payments made to Preferred
Equity Holder by any Person that is not a Borrower Party, if such other Person is a Guarantor . .
. then Preferred Equity Holder agrees that that Preferred Equity Holder shall not accept (or
otherwise be entitled to retain) any such distributions or payment from such Guarantor . . . at
any time after Preferred Equity Holder has received written notice from Lender that there is
outstanding a claim against such Guarantor in connection with the Loan which claim has not
been fully satisfied."

Recognition Agreement, § 1(j) (italics in original, underlined emphasis added). JA241.
[4] The Company has since instituted a lender liability lawsuit against the senior lender for this
conduct and is defending against the foreclosure proceeding. *See Marine Club Associates, LLC, v.
Wells Fargo Bank, N.A., as Trustee for the Benefit of the Holders of COMM 2014-CCRE21*

increase in the mortgage payment with effectively no notice and became behind on

its mortgage payments starting in November 2019.  JA696.  That month, the

mortgage payment made on November 6, 2019, was short $87,000, *i.e.* the amount of

the increased escrow reserves.  JA696.  RB discovered that the Company was behind

with the Senior Lender in November 2019.  JA697.  Despite knowing that the Senior

Loan was behind, RB accepted the Minimum Distributions from December 2019

through March 2020.  JA698; JA809.  RB has never returned those payments to the

Company nor has it transferred those payments to the Senior Lender to bring the loan

current.  JA698.

     As the nation and the City of Philadelphia entered Covid-19 lockdown in

March 2020, many residents of the Property were let go from their jobs, not receiving

a salary, or had their businesses shut down, including Marine Club's largest tenant.

JA698.  The Company contacted RB and requested that it be permitted to forbear on

the minimum distribution payments.  JA699.  RB Commercial agreed.  JA699.  The

forbearance was open-ended in that it had no specified end date.  JA699.  Internal

documents and public SEC filings of RB's parent company, non-party New York

Mortgage Trust, confirm that RB agreed to forbear on the minimum distribution

payments.  JA699.

     On April 7, 2020, RB and Mr. Blumenfeld entered into a Pre-Negotiation

---

*Mortgage Trust*, July Term 2021, No. 1565 (C.C.P. Phila.).

Agreement ("PNA") in which Mr. Blumenfeld agreed to release any claims against RB prior to the date of the PNA and that any formal forbearance agreement would be reduced to writing. JA803. Neither the Company nor Marine Club Manager is a party to the PNA. JA803.

On July 14, 2020, the Company discovered that RB was communicating to the Senior Lender behind its back and disclosing confidential information to it, and demanded to be included in all communications with the Senior Lender. JA701. The very next day, however, RB ignored the Company's request and continued to exclude the Company in all communications with the Senior Lender. JA701.

On September 15, 2020, the Senior Lender declared an event of default under the Senior Loan. JA804. In April 2021, the Senior Lender instituted remedial measures by filing a suit in foreclosure against the Company. JA804.

On October 16, 2020, RB declared a changeover event by letter to both Marine Club Manager Inc. and Eric Blumenfeld, asserting that Mr. Blumenfeld as sponsor owed full recourse liabilities to RB "in the amount necessary for the repayment of the Required Redemption Amount." JA809.

## II.     The Underlying Arbitration

In November 2020, RB instituted the instant arbitration. The parties proceeded through a brief period of discovery, with the arbitration hearing scheduled for May 2 and 3, 2022.

12

Prior to the arbitration hearings, Mr. Blumenfeld sought to redeem RB directly by the payment of the Required Redemption Amount through the use of non-Property Proceeds. JA801. Despite having previously provided the Required Redemption Amount to him, RB refused to confirm the amount of the Required Redemption Amount or provide its wiring instructions for the transmission of same. JA802.

The matter proceeded to a final hearing in May 2022. The issues to be determined during the arbitration hearing were as follows:

- Whether a Changeover Event occurred when the Company, pursuant to an oral forbearance agreement with RB, did not make its Minimum Distributions to RB during the Covid-19 pandemic.

- Whether a Changeover Event occurred when the Company was unable to renew its security deposit bond at the start of the Covid-19 pandemic due to business closures but thereafter maintained sufficient cash in its accounts to cover the outstanding security deposit liability.

- Whether a Changeover Event occurred when the Company deposited the rents it receives from the Property's tenants in its Operating Account rather than its Clearing Account.

- Whether a Changeover Event occurred when the Senior Lender declared a default of the Senior Loan on September 15, 2020, despite the Senior Lender having taken no remedial action.

- Whether a Full Recourse Event occurred when Mr. Blumenfeld pledged a portion of his equity interest in the Company, despite the OA only precluding as defined therein only an actual "Transfer" of equity interest.

- Whether a Full Recourse Event occurred when Mr. Blumenfeld refused to cooperate with RB's premature demand for a change in the manager of the Company on October 14, 2020.

13

- Whether RB materially breached the OA by (i) retaining and failing to turn over to the Senior Lender the Minimum Distributions it took in December 2019 through March 2020 in violation of the section 7.2 waterfall and the Recognition Agreement; (ii) violating the confidentiality provision contained in section 4.12(a) of the OA by disclosing confidential Company information to the Senior Lender without the permission of the Company, and (iii) materially interfering with the Company's efforts to obtain Covid-19 relief from the Senior Lender.

- The appropriate calculation of the Required Redemption Amount.

JA799.

At the hearing, RB presented evidence seeking to establish that Changeover and Full Recourse Events have occurred, and Appellants presented evidence demonstrating that neither a Changeover nor Full Recourse Event has occurred, and, regardless, that RB had engaged in numerous material breaches of the Operating Agreement by 1) taking minimum distributions before the senior lender, a violation of Section 7.2, and not returning them, (2) disclosing confidential Company information and matters to the senior lender through its master and special servicers and to third party management companies, and (3) obstructing Mr. Blumenfeld's redemption of the preferred equity interest, as well as the implied covenant of good faith and fair dealing by (4) engaging in a pattern of conduct designed to be detrimental to the Company in order to gain control of the Company. which caused significant harm to the Company and also resulted in the Senior Lender erroneously declaring the Senior Loan to be in default.  JA698–704.

The arbitrator issued the Partial Award determining liability on August 4,

14

2022, noting that she would assess prevailing party legal fees in the Final Award.  In
the Partial Award, the arbitrator concluded that the following constituted
Changeover Events:  (1) the non-payment of Minimum Distributions after the last
distribution was made on March 1, 2020 because the Pre-Negotiation Agreement
dated April 7, 2020, between RB and Mr. Blumenfeld precluded RB's oral
agreement with the Company to forbear on the payment of the Minimum
Distributions during the Covid-19 pandemic, (2) not maintaining a security deposit
bond or the security deposit funds in an escrow account, citing a Pennsylvania
statute, (3) depositing Company funds in the Operating Account versus the Clearing
Account because the Senior Loan Documents specify that the funds should first be
placed in the Clearing Account, and (4) the claim by the Senior Lender of an event
of default on September 15, 2020, despite no remedial measures having taken place
until April 2021.  JA657–682.

The arbitrator concluded that the following constituted Full Recourse Events:
(1) the pledge by Mr. Blumenfeld of some of his interest in the Company in support
of another loan despite section 8.1 of the OA only defining the actual Transfer of
equity interest as a Full Recourse Event, and (2) Mr. Blumenfeld's lack of
cooperation as to RB's demand for a change in manager in October 2020.  She also
concluded that Mr. Blumenfeld was directly liable to RB for the repayment of the
RRA pursuant to section 13.2 of the OA.  JA657–682.

15

The arbitrator also determined that the Required Redemption Amount was $5,302,369.93 as of July 5, 2022, with interest accruing at a rate of 19.5% until the RRA is repaid.  JA681.

Although Mr. Blumenfeld disputed many of the conclusions in the Award, in the interest of resolving this prolonged arbitration and to stop RB's continued interference with the Senior Lender, Mr. Blumenfeld, through counsel, sought the wiring instructions for RB so that the Required Redemption Amount as calculated in the initial Partial Award could be transmitted in August 2022.  JA18.  RB refused to provide any wiring instructions and claimed—for the first time—that the RRA cannot be paid by Mr. Blumenfeld until the Senior Loan has been repaid in full. JA18.

As the award provides that interest continues to accrue daily at the windfall rate of 19.5% until the RRA has been repaid, Mr. Blumenfeld transferred the RRA funds to the IOLTA account Braverman Kaskey Garber, P.C. (Appellants' counsel) on August 26, 2022, to stop the accrual of interest.  Mr. Blumenfeld thereafter sought a clarification of the Partial Award from the arbitrator regarding whether he can redeem RB's preferred equity interest now by transmitting the Required Redemption Amount to RB utilizing non-Property Proceeds.  JA18.

Separately, the parties briefed the issue of attorney's fees under the prevailing party provision of the Operating Agreement.  RB claimed to be the

prevailing party and sought $1,944,206.97 in "reasonable" attorney's fees.  JA19.

Appellants opposed this request, arguing that Delaware law only permits the

recovery of "reasonable" fees and RB engaged in wasteful litigation tactics during

the arbitration, that none of the fees incurred were reasonable due to the excessive

hourly rates of the attorneys (sometimes in excess of $940/hour) and overstaffing

of the matter (over 30 attorneys), that the fee bills submitted included legal fees

incurred for non-arbitration related matters, and, that in any event, RB incurred no

attorney fees, because fees were paid by its parent, non-party New York Mortgage

Trust, and were never billed back to RB.  JA19.

Thereafter, the arbitrator issued a clarification of the award dated September

20, 2022.  JA794.  In the clarification, the arbitrator determined that a Full Recourse

Event has occurred such that Mr. Blumenfeld, as Sponsor and Operating Member,

is directly liable to RB for the Required Redemption Amount under section 13.2 of

the OA but that Mr. Blumenfeld could not now redeem RB at present because (1)

Section 7.2 of the Operating Agreement precludes distributions to RB as the Capital

Member from the Company's Property Proceeds ahead of debt service on the Senior

Loan, and (2) Section 13.2 of the Operating Agreement precludes Mr. Blumenfeld

from making distributions to RB while the Senior Lender has a "claim" against Mr.

Blumenfeld, and the Senior Loan is in default and the subject of a foreclosure

proceeding.  JA795–796.

17

The Final Award (the "Award"), incorporating both the Partial Award and

the clarification, also included an assessment of $1,795,846.02 in prevailing party

legal fees, dated September 26, 2022. JA797; JA823. The Award lacks any

explanation or reasoning as to the calculation of the award of attorney's fees, the

reasonableness of fees, or whether RB incurred those fees. JA823.

As provided for in the OA, Appellants requested a AAA appeals panel consider

the Award. JA1124. The AAA appeal was decided on the briefs and the Award was

upheld. JA1117. The AAA appellate panel awarded $75,000 in fees. JA1681.

## SUMMARY OF THE ARGUMENT

First, the Award was issued with manifest disregard of the law of Delaware

and fails to draw its essence from the OA because Mr. Blumenfeld is permitted

under the plain and unambiguous language of both the OA and the Recognition

Agreement to redeem RB's preferred equity interest pursuant to section 13.2 of the

OA. The arbitrator's conclusion that Mr. Blumenfeld could not do so now, despite

having declared a Full Recourse Event, because the Senior Loan is in default is

fabricated, based not upon any applicable contract between the parties but upon the

arbitrator's own notions of right and wrong.

Second, the arbitrator exceeded her powers and denied Appellants a

fundamentally fair hearing by adjudicating a new issue never previously raised by

RB (or any party) regarding whether Mr. Blumenfeld could redeem RB pursuant to

18

section 13.2 of the OA despite failing to provide Appellants with any discovery, a hearing, or argument on this new issue.

Third, the arbitrator manifestly disregarded the law of Delaware requiring that only "reasonable" attorneys fees be assessed pursuant to a contractual fee shifting provision by awarding RB $1,795,846.02 for legal fees that it did not incur "out-of-pocket" or otherwise pay. By modifying the contractual fee shifting provision contained in section 15.19 of the OA to permit recovery of legal fees not incurred by RB, the arbitrator has substituted her own notions of right and wrong for the agreement's plain language and the award thus fails to be drawn from the essence of the OA.

Resolution of the aforementioned issues on appeal in favor of Appellants would moot the remaining issues on appeal as to the Changeover and Full Recourse Event declaratory judgments because RB would be forced to accept the tender of the RRA from Mr. Blumenfeld, whereupon RB's preferred equity interest in the Company and any remaining rights it may have pursuant to a Changeover or Full Recourse Event would be extinguished.

In the alternative, however, the arbitrator manifestly disregarded the law and the award failed to draw its essence from the OA by concluding that certain Changeover Events and Full Recourse Events have occurred.

Finally, the arbitrator manifestly disregarded the law and the award failed to

19

draw its essence from the OA by summarily denying Appellants' claims for material breach of the OA against RB based on a Pre-Negotiation Agreement executed between RB and Mr. Blumenfeld, which did not, in fact, release any claims that the Company and Marine Club Manager have against RB and by concluding that Appellants had not proven RB's breach of the confidentiality provision, section 4.12(a), of the OA because Appellants did not demonstrate a causal connection between the breach and the Senior Lender's declaration of default, a requirement not included in section 4.12(a) for such breach to be actionable.

## ARGUMENT

### I.     Standard Of Review

When presented with an appeal of a district court's decision to confirm or vacate an arbitration award, this Court reviews the district court's findings of facts for clear error and its conclusions of law de novo.  *Choice Hotels Int'l, Inc. v. SM Property Mgmt., LLC*, 519 F.3d 200, 207 (4th Cir. 2008).  "[C]ourts owe no deference to an arbitrator who has failed to provide the parties with a full and fair hearing." *Int'l Union, United Mine Workers of America v. Marrowbone Dev. Co.*, 232 F.3d 383, 388 (4th Cir. 2000).  "[A]lthough the authority of an arbitrator is broad, and subject to great deference under the applicable standard of review, it is not unlimited." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235 (4th Cir. 2006) (internal citations omitted).

The Federal Arbitration Act (the "FAA") gives the federal courts express

20

authority to vacate an arbitration award under the following circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.

The permissible common law grounds for vacating such an award include those circumstances where an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law. *See Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 & n. 5 (4th Cir. 1998); *Patten*, 441 F.3d at 234. An award fails to draw its essence from the contract when an arbitrator has disregarded or modified unambiguous contract provisions or based an award upon his own personal notions of right and wrong. *Patten*, 441 F.3d at 235. "To establish manifest disregard, a party must demonstrate: '(1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the arbitrator refused to apply that legal principle.'" *Warfield v. ICON Advisers, Inc.*, 26 F.4th 666, 669 (4th Cir. 2022) (quoting *Jones v. Dancel*, 792 F.3d 395, 402 (4th Cir. 2015)).

Finally, a district court is entitled to vacate an arbitration award if the arbitrator's refusal to hear pertinent and material evidence deprives a party to the

21

proceeding of a fundamentally fair hearing. *See Marrowbone*, 232 F.3d at 388

(concluding that arbitrator committed misconduct by failing to provide parties with

full and fair hearing).

**II.    Discussion Of The Issues**

> **A.    The Arbitrator Manifestly Disregarded Delaware Law In Failing To Apply The Plain And Unambiguous Terms Of Section 13.2 Of The Operating Agreement And Instead Disregarded And Modified Section 13.2 Based Upon Own Her Personal Notions Of Right And Wrong In Concluding That Mr. Blumenfeld Could Not Redeem RB Pursuant To That Section Utilizing Non-Property Proceeds Despite The Senior Lender Having Not Claim Against Him As Guarantor Of The Senior Loan.**

Whether Mr. Blumenfeld can redeem RB's preferred equity interest in the

Company utilizing non-Property Proceeds by paying the Required Redemption

Amount as calculated in the Award is a threshold issue on appeal because the

determination that Mr. Blumenfeld can redeem RB would extinguish any further

right or interest that it has in the Company and moot the remaining issues for appeal

other than the calculation of the attorney's fees awardable to RB as the purported

prevailing party.[5]

Under the well-established law of the Supreme Court of Delaware, "[a] court

must accept and apply the plain meaning of an unambiguous term in the context of

the contract language and circumstances." *Lorillard Tobacco v. Am. Legacy Found.*,

903 A.2d 728, 740 (Del. 2006).  These principles of contract interpretation and

---

[5] Those fees, however, are owed separate and apart from the Required Redemption Amount.

application are not subject to debate.

Section 13.2 of the Operating Agreement plainly and unambiguously provides that upon the occurrence of a Full Recourse Event, "the Sponsor [Mr. Blumenfeld] shall become fully liable for the repayment of the Required Redemption Amount (and the Capital Member's [RB] Investment shall thereupon be redeemed." The arbitrator invoked section 13.2 in declaring certain Full Recourse Events had occurred and that Mr. Blumenfeld was fully liable for the RRA. As such, by operation of the arbitrator's declaratory judgment and section 13.2, RB's preferred equity interest is redeemed and it may only seek direct recourse against Mr. Blumenfeld for repayment of the RRA.

The only limitation on the repayment by the Sponsor of the RRA under section 13.2 is that the Senior Lender must have no outstanding claims against the Sponsor as guarantor of the Senior Loan. As the Senior Lender has no claims against Mr. Blumenfeld, Mr. Blumenfeld rightfully tendered the RRA utilizing his own—not Company—funds in August 2022. In rendering the award, however, rather than apply the plain language of this provision as written, the arbitrator modified the "no claim" limitation by concluding that because the Senior Loan is in default and because the waterfall provision of section 7.2 of the OA sets forth the priority of distributions of the Company's Property Proceeds, Mr. Blumenfeld cannot repay the RRA as Sponsor pursuant to section 13.2 until the Senior Loan has

23

been repaid.[6]  This portion of the Award must be vacated for the following reasons.

First, Section 7.2, otherwise known as the "waterfall" provision governing distribution priority of Company funds, only applies to "Property Proceeds" distributed from the "Company."  Specifically, Article VII only governs distributions from the *Company* to Members, OA, § 7.1, and Section 7.2's definition of "Property Proceeds" *excludes* monies paid by third parties, OA, § 7.2.  Money distributed from third parties utilizing non-Property Proceeds, such as from Mr. Blumenfeld as Sponsor, may be distributed beyond the scope of the waterfall contained in Section 7.2.  This conclusion is supported by the plain and unambiguous language of the definitions and provisions of the Operating Agreement, and any other interpretation would render section 13.2 superfluous as there would be no point to permitting RB direct recourse against Mr. Blumenfeld as Operating Member/Sponsor if such recourse was subject to the Company's restrictions on distributions of Property Proceeds contained in Section 7.2.  The entire purpose of a Full Recourse Event is so that RB can circumvent the waterfall contained in Section 7.2 to immediately and directly obtain the Required Redemption Amount from Mr. Blumenfeld without regard to the distribution of the Company's Property Proceeds.  The arbitrator modified the OA when she concluded that the waterfall provisions of section 7.2 applied to a redemption under section 13.2.

---

[6] The practical implications of this ruling are absurd:  while the RRA remains unpaid, interest will accrue on it at a rate of 19.5%.

24

Second, the Operating Agreement expressly permits Mr. Blumenfeld as Sponsor to redeem RB so long as the Senior Lender has no "claim" pending against Mr. Blumenfeld. The Senior Lender has no "claim" against Mr. Blumenfeld, and there is no evidence in the record that the Senior Lender has any "claim" against him. The only evidence in the record is that the Senior Lender has a foreclosure action proceeding against the Company only as to the realty and fixtures of the Property, which the Company is aggressively defending. *See*, *e.g.*, *Wells Fargo v. Marine Club Associates, LLC*, No. 210400745 (C.C.P. Phila.) The Senior Lender has made no claim against Mr. Blumenfeld as guarantor of the Senior Loan.

Third, a redemption by Mr. Blumenfeld pursuant to section 13.2 of the Operating Agreement is separate, distinct, and operates independently from the requirements of a Voluntary Redemption by the Company pursuant to sections 12.1 and 12.2. The Voluntary Redemption provisions do not apply to a Full Recourse Redemption under section 13.2. The clear and plain language of section 13.2 explicitly provides that upon the occurrence of a Full Recourse Event, which the arbitrator concluded had occurred, "the Capital Member's Investment shall thereupon be redeemed."

Fourth, Mr. Blumenfeld's redemption of RB is also expressly permitted in the Recognition Agreement entered into between the Senior Lender and RB. Section 1(j) of the Recognition Agreement permits RB to accept payments from a non-

25

Borrower Party including a guarantor of the Senior Loan such as Mr. Blumenfeld so long as the Senior Lender has no unsatisfied claims against the Guarantor. The Senior Lender has no claims against Mr. Blumenfeld, much less any unsatisfied claims, and Mr. Blumenfeld is not a Borrower Party as that term is defined in the Recognition Agreement.

The arbitrator erred in concluding that Mr. Blumenfeld's redemption of RB under section 13.2 of the OA is subject to the waterfall and voluntary redemption provisions of the OA and that the senior lender has a "claim" against Mr. Blumenfeld, which conclusions were reached in manifest disregard to the well-established law of Delaware in the application of plain and clear contract provisions and in so doing, the Final Award as to this issue fails to draw its essence from the Operating Agreement and must be vacated.

> **B. The Arbitrator Exceeded Her Powers And Denied Appellants A Fundamentally Fair Hearing By Adjudicating A New Issue Raised For The First Time By RB After The Conclusion Of The Hearing And The Issuance Of The Partial Award Without Providing Appellants Any Opportunity For Discovery, A Hearing, Or Briefing Regarding Whether Mr. Blumenfeld Can Redeem RB Pursuant To Section 13.2 Of The OA.**

As discussed *supra*, RB raised a new issue as to whether Mr. Blumenfeld could redeem RB pursuant to section 13.2 of the OA and the arbitrator's declaration in the Partial Award that certain Full Recourse Events had occurred for the first time in August 2020.

26

This new issue was raised by RB after the hearings had closed, after post-hearing briefing had concluded, and after the Partial Award on liability had been rendered.  The arbitrator agreed with RB and concluded in the Final Award that Mr. Blumenfeld could not redeem RB until the Senior Loan was current.  Prior to doing so, however, the arbitrator failed to provide Appellants with an opportunity for discovery, a hearing, or argument on this issue.  By failing to provide Appellants with notice of this new claim, discovery as to it, and an opportunity to be heard in a meaningful hearing regarding its merits, the arbitrator exceeded her authority and denied Appellants a fundamentally fair hearing.

### C.    The Arbitrator Manifestly Disregarded Delaware Law In Awarding Unreasonable Attorneys Fees To RB, Who Did Not Incur Such Fees "Out-Of-Pocket" As Required By Section 15.19 Of The Operating Agreement And Instead Awarded Those Fees To RB Based Upon Her Own Personal Notions Of Right And Wrong.

The Award should be vacated as to the award of attorneys fees because the arbitrator modified the fee shifting provision contained in section 15.19 of the OA by permitting RB to be reimbursed for attorneys fees that it did not incur "out-of-pocket" and the fees awarded that were incurred by a third party were patently unreasonable, in violation of Delaware law.

First, section 15.19 of the OA explicitly limits the fees a prevailing party in any arbitration initiated under the OA may recover:  "The prevailing party in any arbitration proceeding shall be entitled to an award of all reasonable <u>out-of-pocket</u>

costs and expenses (including attorneys' and arbitrators' fees) related to the entire

arbitration proceeding (including review if applicable)." (emphasis added.)  RB

admitted at the hearing that it did not incur any attorneys fees, as those fees were

billed to and paid by New York Mortgage Trust.  The arbitrator manifestly

disregarded Delaware law by ignoring the plain and unambiguous language

limiting the recovery of fees to those incurred by RB "out-of-pocket" and instead

substituted her own interpretation of the unambiguous fee shifting provision based

upon her person opinions by awarding $1,795,846.02 in fees that were incurred by

New York Mortgage Trust.  Under the plain language of section 15.19 of the

Operating Agreement, RB was entitled to no reimbursement of fees or expenses.

Second, under settled Delaware law, a court or arbitrator must consider the

factors set forth in Delaware Lawyers' Rule of Professional Conduct 1.5 in assessing

the reasonableness of attorneys' fees.  *See Mahani v. Edix Media Gp., Inc.*, 935 A.2d

242, 245–46 (Del. 2007).  The factors in Rule 1.5 include, in pertinent part:

> (1) the time and labor required, the novelty and difficulty of the
> questions involved, and the skill requisite to perform the legal service
> properly; . . .
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained; . . . [and]
>
> (7) the experience, reputation, and ability of the lawyer or lawyers
> performing the services; and

Del. Lawyers' Rules of Prof'l Conduct R. 1.5(a).

The arbitrator failed to follow Delaware law in evaluating RB's request for reimbursement of New York Mortgage Trust's attorneys fees, which were highly irregular and patently unreasonable. New York Mortgage Trust over-litigated this arbitration, staffing the matter with over 30 attorneys and also electing to hire attorneys from Pittsburgh, Pennsylvania (rather than local attorneys in Charlotte, North Carolina) at exorbitant billing rates, including a partner rate of $940.50 an hour whereas the prevailing rate for commercial litigation attorneys in Charlotte is under $500, and routinely billed for multiple attorneys to attend the same hearings, depositions, phone conferences, and interoffice meetings. Further, as New York Mortgage Trust admits, it undertook no effort whatsoever to request or require its counsel to develop or adhere to a litigation budget or to otherwise question the reasonableness of the fees billed. Under Delaware law, these fees are unreasonable and thus may not be awarded, without regard to whether RB incurred them.

**D.    In The Alternative, The Arbitrator Manifestly Disregarded Delaware Law Requiring The Application Of Plain And Unambiguous Contract Terms By Declaring Full Recourse Events Have Occurred And Modified The Definitions Of Full Recourse Events Such That The Declaratory Judgment Portion Of The Award Declaring That Full Recourse Events Have Occurred Fails To Draw Its Essence From The OA.**

The Award should be vacated to the extent that Full Recourse Events have been declared because the arbitrator modified the terms of the OA as to what constitutes a Full Recourse Event based on her own notions of right and wrong.

29

First, the arbitrator manifestly disregarded the law of Delaware in the by ignoring the plain and unambiguous contractual terms in declaring a Full Recourse Event such that the declaratory judgment fails to draw its essence from the OA because the OA only provides that a <u>transfer</u> of a member's equity interest in the Company is a Full Recourse Event under Section 13.2 and the arbitrator concluded only that Mr. Blumenfeld <u>pledged</u> some of his equity interest in the Company. The Operating Agreement excludes a pledge from the definition of a "Transfer," and none of Mr. Blumenfeld's equity interest in the Company has been transferred.

Under the plain and unambiguous language of the Operating Agreement, a Full Recourse Event occurs when there is a "[b]reach of restrictions contained in this Agreement or the Senior Mortgage Loan Documents on (i) transfer for the Property and interests therein (other than by virtue of a Minor Lease), or (ii) <u>transfer</u> of interests (direct or indirect) in the Company." OA, § 13.2(iv) (emphasis added). Mr. Blumenfeld, however, has breached no restriction contained in the Operating Agreement as to the transfer of his interests in the Company because (1) no transfer of his interests has occurred, and (2) a pledge of his interests is excluded from the definition of "Transfer" in the Operating Agreement.

Section 3.2 of the Operating Agreement, entitled "Dispositions of Membership Interests" defines "Transfer" and excludes from that definition a pledge. Further, under the plain language of Section 3.2, only a *transfer* of

30

membership interest requires written consent:

> (a) Neither the Operating Member nor the Sponsor may make an assignment, transfer, or other disposition (voluntarily, involuntarily or by operation of law) (a "**Transfer**") of all or any portion of its Membership Interest, nor pledge, mortgage, hypothecate, grant a security interest in, or otherwise encumber (an "Encumbrance") all of any portion of its Membership Interest, except with Requisite Consent if:
>
>> (i) Such Transfer reduces Sponsor's legal or equitable interest in Operating Member;
>>
>> (ii) Such Transfer or series of transfers of any legal or equitable interest in any entity or entities that results in a change of ultimate control of Operating Member;
>>
>> (iii) Such Transfer or series of transfers of any legal or equitable interest that results in any party that was not a Significant Owner before such transfer (or series of transfers) becoming a Significant Owner thereafter. For purposes of this provision, a "Significant Owner" is an individual or entity that owns, directly or indirectly, 25% or more of the equity interests in Operating Member;
>>
>> (iv) It is a Transfer of any interests in the Company by Operating Member.
>
> Any attempted Transfer of, or granting of an Encumbrance on, all or any portion of a Membership Interest, other than in strict accordance with this Section 3.2, shall be void.

OA, § 3.2(a). Here, a pledge is not included within the definition of a "Transfer" and is instead considered an "Encumbrance." Under Section 3.2(a)(i)–(iv), only "Transfers" require the "Requisite Consent" of RB. An encumbrance such as a pledge does *not* require "Requisite Consent." Thus, Mr. Blumenfeld's pledge of any of his interest in the Company does not require Requisite Consent from RB and cannot be a Full Recourse Event.

Second, the arbitrator manifestly disregarded the law regarding the application of plain and unambiguous terms of the OA such that the declaratory judgment does not derive from the essence of the OA in concluding that a Full Recourse Event occurred when Mr. Blumenfeld refused to cooperate with RB's demands for a change in management of the Company in October 2020.

Under section 13.2(iv) of the OA, a Full Recourse Event only occurs when the Operating Member "interfere[es] with Capital Member's exercise of its rights or remedies <u>arising as a result of the occurrence of a Changeover Event</u>" (emphasis added).

As of October 16, 2020, when RB wrongly demanded that Mr. Blumenfeld cooperate with a change of Manager for the Company, no Changeover Event had yet occurred. These purported Changeover Events are discussed individually, *infra*. Thus, Mr. Blumenfeld had no duty under the Operating Agreement to cooperate with an erroneous demand for manager change.

> **E. The Arbitrator Manifestly Disregarded Delaware Law Requiring The Application Of Plain And Unambiguous Contract Terms By Declaring Changeover Events Have Occurred And Instead Modified The Definitions Of Changeover Events, And, Therefore, The Declaratory Judgment Portion Of The Award Declaring That Changeover Events Have Occurred Fails To Draw Its Essence From The OA.**

First, under the plain and unambiguous provisions of the Operating Agreement, no Changeover Event can occur regarding the Senior Lender's

32

declaration of an event of default <u>until</u> the Senior Lender also commences remedial action based upon that declaration of default.  OA, § 8.1(f).  The Senior Lender had not commenced remedial measures as of September 15, 2020, thus, the arbitrator's conclusion that the declaration of an event of default on that date is a Changeover Event is a modification of section 8.1(f) that is not derived from the essence of the OA.

The Operating Agreement explicitly limits that a Changeover Event only occurs in connection with a declaration of default when and only when the Senior Lender also commences remedial measures:

> (f)  The claim by Senior Mortgage Lender of the occurrence of an Event of Default under the Senior Mortgagee, <u>together with Senior Mortgagees' commencement of remedial action as a result of such claimed default</u>. OA, § 8.1(f) (emphasis added).

The Senior Lender did not commence remedial action until April 2021, when it filed the Foreclosure Action against the Company.  *See generally Wells Fargo v. Marine Club Associates, LLC*, No. 210400745 (C.C.P. Phila.).  No party disputes that the remedial action did not occur until April 2021—well after the arbitrator's conclusion that a Changeover Event based on a declaration of default occurred in September 2020.

Second, under Section 8.1(d) of the Operating Agreement, a Changeover Event occurs when:

> The Operating Member's . . . (ii) <u>intentional misapplication of any</u>

33

> <u>funds derived from the Property,</u> including without limiting the
> generality of the foregoing, security deposits, <u>insurance proceeds and</u>
> <u>condemnation awards</u>[.]

OA, § 8.1(d)(ii) (emphasis added).  The arbitrator concluded that a Changeover Event

occurred when the Company deposited rents and other funds in its Operating Account

rather than its Clearing Account because the Senior Loan Documents require that those

funds be deposited into the Clearing Account.  No provision of the OA, however,

requires the rents from the Company or other Company funds be deposited into a

certain account, and all rents, security deposits, and other monies derived from the

Property have been maintained in the Company's bank accounts, including either the

Clearing Account or the Operating Agreement.  There is no evidence in the record

that the funds have ever been "intentionally misappl[ied]."  The arbitrator ignored the

plain and unambiguous language of the OA—which does not require Property

Proceeds or other funds be deposited in a certain account—and based on her own

personal notions of right and wrong injected a new requirement that a Changeover

Event occurs when the Company does not deposit funds into a certain account

required by the Senior Loan Documents—not the Operating Agreement.

Third, section 8.2 of the Operating Agreement provides a Changeover Event

occurs upon "the occurrence of any act in <u>material</u> violation by the Manager of, or

<u>material</u> failure by the Manager under, <u>this Agreement</u>." (emphasis added).   The

arbitrator concluded that under Section 8.2, the failure to place tenants' security

34

deposits in an escrow account or maintain a security deposit bond is a "material failure" and a Changeover Event.  The arbitrator based her reasoning on a Pennsylvania statute and not the terms of the OA.  No provision of the OA requires the Company or Marine Club Manager as Manager of the Company to maintain a security deposit bond or to maintain the security deposits in a special escrow account.  This as a matter of law precludes the finding that a Changeover Event occurred pursuant to Section 8.2, which is expressly limited to violations or failures "under this Agreement."  Therefore, Marine Club Manager's maintenance of the security deposits in an amount that exceeds the total security deposit liability is not a Changeover Event.

Fourth, section 8.1(a) of the OA provides that the "[f]ailure to make a Minimum Distribution <u>when due</u>" is a Changeover Event (emphasis added).  In the award, the arbitrator acknowledged that RB agreed to orally forbear on the Minimum Distributions during the Covid-19 pandemic, a fact that was undisputed at the hearing, but concluded that the Pre-Negotiation Agreement between RB and Mr. Blumenfeld required any modifications to the payment or forbearance on the Minimum Distributions to be made in writing and thus the oral agreement between RB and the Company is unenforceable.  Once again, the arbitrator implied a new contractual requirement to the OA rather than applying the plain and unambiguous language of section 8.1(a) because neither Marine Club Manager nor the Company

entered into the PNA with RB.

  **F. The Arbitrator Manifestly Disregarded Delaware Law In Failing To Apply The Plain And Unambiguous Language Of The OA To Appellants' Claims Of Material Breach And Instead Modified The Breached Provisions Based On Her Own Notions Of Right And Wrong Such That The Denial Of Those Claims In The Award Is Not Drawn From The Essence Of The OA.**

  The arbitrator summarily denied Appellants' serious and substantiated claims of material breach by RB in the Award by concluding that (i) the PNA executed between RB and Mr. Blumenfeld also applied to bar claims asserted by Marine Club Manager on behalf of the Company, and (ii) modifying the confidentiality provision of the OA by requiring Appellant to prove that the breach of it resulted in the Senior Lender declaring an event of default.

  First, the arbitrator manifestly disregarded the law of Delaware in concluding that the PNA executed between RB and Mr. Blumenfeld also released any claims either the Company or Marine Club Manager had against RB that occurred prior to April 7, 2020, *i.e.* RB's retention and failure to turn over the Minimum Distributions made from December 2019 through March 2020.  Neither the Company nor Marine Club Manager are signatories to the PNA, nor have they been released from it. Rather than apply the PNA as written and evaluate the merits of Appellants' material breach claims regarding RB's retention, the arbitrator modified it to include a release of claims by the Company and Marine Club Manager.  None of the Company's claims, enforced herein through Marine Club Manager, Inc. as Manager of the

36

Company against RB were released in the PNA because neither the Company nor

Marine Club Manager is a party to that agreement.

Appellants expressly demonstrated the link between RB's retention of the

Minimum Distributions and the declaration of the event of default such that RB's

actions materially breached the OA. Under section 7.2 of the OA as well as

section 1(c) of the Recognition Agreement, RB had an affirmative duty to

immediately deliver the Minimum Distributions it retained to the Senior Lender

once it knew that it had received them ahead of the debt service on the Senior

Loan:

> Preferred Equity Holder shall only accept or receive payments . . .
> from Borrower and/or from the Collateral on account of the Preferred
> Equity Interest . . . prior to the date that all obligations of Borrower to
> Lender under the Loan Documents are paid, to the extent such
> payments constitute Distributable Cash, and if any other payment on
> account of the Preferred Equity Interest is received by Preferred
> Equity Holder, such payment or collateral shall be delivered
> immediately by Preferred Equity Holder to Lender for application in
> accordance with the Loan Agreement.

Recognition Agreement, § 1(c) (emphasis added). As of November 2019, RB knew

that the Company was partially behind on its Senior Loan payment due to an

improper escrow increase, and yet it retained the Minimum Distributions distributed

from December 2019 through March 2020. The payments wrongfully retained by

RB would have cured the late payment to the Senior Lender; thus, RB's retention of

those payments is the direct cause of the Company's payment default.

Second, Appellants argued that RB violated the Operating Agreement by disclosing confidential Company information that was disparaging to the Company to the Lenior lender without the express permission of the Company in violation of section 4.12(a) of the OA. The arbitrator concluded however that RB did not materially breach the confidentiality provision of the OA because Appellants did not establish "a causal connection between [RB's] communications with the [Senior] loan servicer and the event of default." There is no requirement, however, that the disclosure of the confidential information needs to have caused an event of default to be actionable under the confidentiality provision of the OA. The arbitrator's conclusion thus modified the requirements for a breach of the confidentiality provision in an such a manner that the denial of the material breach claim as to that provision in the Award is not derived from the essence of the OA.

## CONCLUSION

Against the foregoing, Appellants respectfully request that the Court reverse the district court's judgment of August 2, 2023, and remand with directions to vacate the Award in its entirety.

Respectfully submitted,

**BRAVERMAN KASKEY GARBER P.C.**

Dated: September 25, 2023        */s/ Benjamin A. Garber*
                                 BENJAMIN A. GARBER,

38

MELISSA A. ANDERSON
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, Pennsylvania 19103

Neil A. Riemann
PARRY LAW PLLC
100 Europa Center Drive, Suite 351
Chapel Hill, NC 27517

*Counsel for Appellants*

## **CERTIFICATE OF COMPLIANCE WITH FED. R. APP. 32(A)**

This Opening Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 9,574 words. This Opening Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief is prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font, a Roman typeface.

*/s/ Benjamin A. Garber*
Benjamin A. Garber

40